You can correct my pronunciation if I need to be corrected, because everybody deserves to have their name pronounced correctly. You may proceed. Good morning, Your Honors. May it please the Court, I am Ryan Watson, Counsel for Petitioner Maria Suyapa Gonzales-Veliz, so you got it right. Although this case implicates a number of issues, there are three key points that are more than sufficient to resolve the case. First, as to the claim under the INA, the government rests its entire defense of BIA's ruling on the nexus issue. And on that issue, BIA affirmed the view that Bonilla was solely motivated by retribution for a child support request when he raped Suyapa while declaring that she could not be with another man, and branded her near her genitals to mark her forever. That holding is plainly incorrect. Second, BIA's rejection of the claim under the Convention Against Torture rests on only one sentence that contains no reasoning, points to no facts, and does not even adopt the flawed reasoning of the IJ. Third, when an intervening change in legal standards affects how a party would try its case, specifically remand to the immigration judge is required. Why is it to the immigration judge rather than the BIA in this circumstance? So we cited more than a dozen cases that support the argument that when there is an intervening change in the law, the remand to the IJ is appropriate. I'm happy to discuss those cases. But at bottom, the thinking behind them is when the legal standard has changed, it not only affects the arguments that the parties will present, but it could affect the evidentiary submissions as well. And the entire immigration court system is set up such that the IJ is the initial adjudicator. The parties could submit their evidence and arguments. But has it changed? Or did it just revert back to the text of what should have been considered under the statute? So that's not really a change, is it? If it just said you have not been faithful to the statute, we're going to make sure we're faithful. That's not a change in the law. So the ARCG case, which was the governing on-point precedential BIA decision as of the time that Suyappa was proceeding in the immigration judge level, that was the governing case that she premised her entire case on. That case has now been overruled by AB. Now, we have a number of arguments in the supplemental briefing about what exactly AB does or does not do. But one thing that's clear is that ARCG, as a precedential matter, has been overruled. And so that's the basis that we're saying it would be appropriate to remand to the IJ so that the parties could each make their submissions, both arguments and evidence, in light of that. And the Caudry case from the First Circuit, the Wu case from this court, are all cases where there was an intervening change in the legal standard and the Court of Appeals did not apply that new standard to the facts, didn't tell BIA to do so, but rather remanded to the BIA with instructions to remand to the IJ. Right, but it's separately, it has these other reasons, right? And you have to show that there's a great deferential standard for these other first two reasons that you've given. So if you don't win on those, you don't automatically get to remand on that reason, do you? So I'll briefly respond to that point and then hopefully get to those two points and happy to talk about the standards that apply there. Those cases that we cited for the proposition that remand to the IJ is appropriate do not hinge on a predicate finding by the court that the change in law was favorable or that the petitioner could definitely succeed under the old standard and thus they are entitled to a remand. If you look at the Caudry case from the First Circuit, Caudry versus Mukasey, it's a great example. The issue in that case was when does harm rise to the level of economic persecution? And over the years, BIA and the Courts of Appeals had applied three different standards for that and it was kind of a mess. The BIA rejected Mr. Caudry's claim and he was pursuing his further appellate remedies. Then the BIA issued a new decision that clarified what the standard would be. The First Circuit said, we don't actually know which standard the BIA and the IJ applied in this case, but now we have a clarification of the standard and it's appropriate to send it back to the IJ. They didn't say, let's first determine whether he would succeed under the old standard and they didn't say, is this change in law favorable or hostile or somewhere in between? In fact, it seemed to be somewhere in between. But the point is, they weren't doing that as a predicate aspect before the remand. So you think it's irrelevant if we would rule that the BIA was correct on the first two points? We think it would be appropriate for you to remand to the IJ without reaching a determination of whether we win under ARCG on the nexus point or the convention. So is all your eggs really in that basket? Which basket is that, Your Honor? The basket to go back to the IJ? Because if you don't win on these other points, and that's just for not foreshadowing, it's No, all of our eggs are not in that basket. That's one of the three key points I wanted to emphasize today and I'm happy to move to our other two baskets. Well, I have one more basket to ask you about. It seems that your client is barred under our binding case law regardless because of her going back after when she's had the conviction. Isn't that right? Isn't she barred under our case law? So there were three claims that she brought for asylum, for withholding of removal, and for the convention against torture. Your question goes only to the asylum claim? Right. She's barred under asylum, isn't she? So we have preserved for potential further appellate review the argument that the regulations barring asylum seekers with reinstated removal orders. That is an unreasonable interpretation, but as a matter of fiscal precedent right now, the reinstatement of her removal order does preclude her from seeking asylum. We have the separate argument. It's in the briefs and I won't focus on it today, but we have the separate argument that you may nevertheless be able to pursue a collateral attack when the reinstated removal order was improperly provided there, but I won't dwell on that. We don't allow that collateral attack, don't we? We have cases that have not allowed that collateral attack. The Ramirez-Molina case, which is a 2006 decision of this court, says that it doesn't hold. That was not a successful claim in that case, but it does acknowledge the possibility. But I thought since then we've cut those, we have not allowed those. Maybe I'm wrong. I don't want to take your time unnecessarily. I'll look it up. Thank you. So the first of the three points that I wanted to emphasize today is under the INA claim. The government's defense of the BIA's dismissal of the INA claim rests just on the Nexus holding and to briefly review what that holding was, BIA endorsed the view that persecution was Depending on what the BIA meant by that, it was either legal error or factual error, and I'll explain. If the BIA meant that Suyapa cannot satisfy the Nexus requirement because the child support suit was an initial reason for the persecution, that is legal error under Sharma v. Holder. Sharma was the case joined by Judges Elrod and Riedley in which a group of people was initially kidnapped and mistreated for an unprotected ground. While in detention, the disagreed with the political views of one of the people, they held that person longer and mistreated him more severely. In this court said, even though the initial reason for the persecution was unprotected, at some point there was a central reason that was protected and that's enough. As a factual matter, if the BIA meant that the child support suit was Bonilla's only central motivation for each and every instance of persecution, both initially and subsequently, then that conclusion is belied by the record. Bonilla's words and actions reflected his belief grounded in Honduran societal and cultural norms that Suyapa, as a woman in a domestic relationship, had no right to leave that relationship. Bonilla branded her near her genitals to mark her forever. He told her while raping her that she could not be with another man, otherwise he would kill her. He told her that she had no rights in the context of saying that she couldn't be with another man. The nature of his intimate sexual violence and possessory conduct, including at least three rapes, branding, and all of the horrific things we've discussed here, plainly reveal that his central motivation, at least a central motivation, was to keep her trapped in this sexual relationship. Plainly reveal? That's correct. What is the standard by which we review this? It's a substantial evidence standard, which I'll admit is not an easy standard to surmount. It, however, is not insurmountable. The Sharma case that I just discussed, the sealed petitioner versus sealed respondent case from this court, the Sarhan case from the Seventh Circuit, these are all examples of substantial evidence review of a nexus holding in which the Court of Appeals granted the petition for review and remanded because there was not substantial evidence supporting it. Here the only thing that the BIA said was that Bonilla was centrally motivated only by the child support suit. What we have to show, as a legal matter, is that a central reason, not the only reason, not even necessarily the initial reason, but that the a central reason for the persecution was a protected ground. We think that we've done that. It's implausible to think that keeping Suyappa trapped in a sexual relationship was not a central reason for this conduct. And I will just mention briefly that I think it's a bit of a false dichotomy that the BIA had between the child support order on the one hand and the protected ground on the other hand. If there was any reason that the child support suit irked Bonilla, it was that it was a public and explicit and permanent declaration by Suyappa that she was attempting to leave that relationship. In any event, if he was motivated simply by a financial retribution for the fact that she was seeking this money from him, you might expect him to have robbed her or to have countersued or something like that. But instead, what he did was set out on this course of conduct that, by its nature, demonstrates his motivation. But we also have the benefit of his express words saying that she had no rights, that she could not be with another man, that he was branding her, again, to mark her forever. This is quintessential conduct that would be motivated by that sort of a concern. The other claim that I'd like to discuss today is the claim under the Convention Against Torture. And there we have two basic arguments for why the BIA's treatment of that issue was wrong. The first of those arguments is that the BIA's reasoning was inadequate as a matter of law. The BIA has to provide its reasoning with clarity so that a court is not compelled to guess at the theory that underlies its decision. That's from the Chenery case. And this court last year in Cabrera also said it's error for the agency to fail to address key evidence. Here, however, BIA denied this entire claim in a conclusory one-sentence denial which contained no reasoning, failed to point to a single piece of evidence, and BIA cannot adequately adjudicate an entire claim simply by copying and pasting a one-sentence boilerplate description of the legal standard. In similar circumstances, courts have remanded for BIA to explain. The Liu case from this court, that's L-I-U, was an asylum case in which it was unclear which of two grounds the BIA was relying on, and this court remanded. The Zelaya case, which we also cite, that's from the Fourth Circuit, was a case where there was a two-sentence section of BIA's opinion that addressed the Catt claim. And in that opinion, the BIA said, we agree with the IJ that the respondent has failed to establish, and then it went on to characterize the standard. And the Fourth Circuit said, that's not enough for us to understand clearly what rationale you're relying on, and it remanded back to the Fourth Circuit. The last case I'll point to on that point is the Tuck-Howanich case from the Ninth Circuit, which is at 64 F. 3rd, 460. But even if the BIA's decision was read— Did you cite that already in your brief? We cited the Liu case and the Zelaya case. But the one you just gave the cite for? Yeah. Did you give it to opposing counsel when you got here today? No, and I'm happy for us to rely on cases— Okay. Well, the better practice would not be to spring a case on them. Y'all been sitting here in the courtroom together, I think, probably. So I would ask that you would—sir, you have up to two days to follow 28J on the case, if you're so inclined. Go ahead. You may proceed. I mean, I'm happy to rely on the cases that we did cite. There are additional cases at page 48 of our first opening— I understand. You have some cases. But if you bring new cases— I understand. Go ahead. My apologies, Your Honor. Even if the BIA's reasoning was held to have adopted the IJ's reasoning, on the acquiescence point, that reasoning is flawed. What the IJ said was that the Honduran government was attempting to take action against Bonilla, including because the police intervened to stop harm one time. But the fact that the police showed up one time and declined to help actually shows that they were consciously choosing not to intervene. They were deliberately choosing not to intervene. Well— It wasn't— Didn't they put him on a red list or something? The Red Alert issue is a complete red herring. Am I wrong on that? That they put him on some kind of list of dangerous people? Yes. It is in the record that there was a red alert out for him. It's not really explained exactly what that means. That is in the record. Neither the IJ nor the BIA relied on that. That was just something that the government mentioned, and it is in the record. But that's a complete red herring. It had nothing to do with Ciapa's case, nothing to do with domestic violence. In fact, it predated the whole situation with Ciapa. It only came to light when she went to the police station to complain about the domestic violence. They told her, oh, there's a red alert out, but we're not going to help you. So it's neither here nor there. The fact that the police showed up that one time, Bonilla told the police not to butt in because this was between couples. The officer said he was going to detain him and he was going to confiscate his weapon and, in fact, briefly took it away. But then, ultimately, Bonilla places a phone call, the officer then gets a phone call, and they hand the gun back and walk away. That is acquiescence. In addition, she filed complaints with the police and with the domestic violence agency, and she got no help there. Q. Counsel, what do we do with the numerous court of appeals cases that say that groups based on domestic violence or gang violence do not constitute a cognizable particular social group, regardless of whether AB exists or not? A. So you don't have to get into the cognizability of the PSG here. It was assumed by the BIA. It's not challenged here by the government. That's something that could be addressed, for example, if you were to remand to the IJ for further proceedings. It could be addressed there. But the case as we presented it at the IJ level and at the BIA level was based on ARCG, and ARCG recognized as a precedential matter that women who are unable to leave a domestic relationship because of these cultural and societal norms and the government non-protection is a cognizable particular social group. Q. But we have cases that say to the contrary, don't we? A. I don't believe you have cases that say to the contrary of what ARCG said. Q. That it's not a cognizable social group, that it's too amorphous to be a group. And these are difficult topics, and certainly the facts of this case are quite heinous, and we're not trying to be callous, but we have to apply the law here. A. Absolutely. Q. So if on the text of the statute it doesn't apply, why can't we decide the case on that? A. I would say that the ordinary course would not be for this court to, especially when there's been an intervening change in the legal standard. Q. Well, it's a dispute whether it's an intervening change. I think the government argued that it wasn't. A. But the cognizability of the particular social group is not disputed here, and it was not addressed by the BIA other than to say that they were assuming that it was cognizable. Q. Okay. How does the Grace injunction affect the appeal? What if, do we have to give any deference to that whatsoever? A. You do not have to give deference to the DDC opinion, which has now been appealed, but there's not a briefing schedule yet in the D.C. Circuit. You don't owe deference to that, but we do think that it is persuasive authority. Q. What if we don't think it's persuasive authority? How does that affect us here? A. So if you don't think it's persuasive authority, then that would not affect the CAT claim that we're presenting. That would not affect the question of whether the nexus holding under ARCG was wrong. If you did reach the AB issues, which neither party is urging you to do, but if you did reach that, then it could influence how you address that. Q. Isn't there a straightforward way to resolve this case? Just straight up on the AB in the text of the statute so that it doesn't apply? A. I certainly don't think it's, I would not agree that it's a straightforward way to resolve the case. In fact, I think it's the least straightforward way to resolve the case, if that's a proper way to put it. The government is not even in the alternative defending the merits of the order on reconsideration, which is where the AB issue came to light in this case. If you look at the Grace case, as we discussed in our 28-J letter, the government's arguments and the DDC opinion are inconsistent with the interpretations of AB that are embodied in the BIA's second order here. Q. Well, they're dealing with the implementation order in that case, not actually the AB itself, aren't they? A. The Grace decision involved AB itself as well. Q. But the injunction and things are regarding the implementation order. A. As I understand it, the challenge in Grace and also the injunction in Grace pertain to two things, both the AB decision and the policy guidance memo that implements that. Q. Oh, I thought it was only as to the policy guidance. Do you think it's to both? A. I think it's as to both, and I think the court, as I recall, the court defined those two things collectively as the, whatever term you used, the challenge policies or something. Q. That's called a challenge policy, so it's not the policies, it's the order itself? A. Both what was challenged and what the injunction was addressing there, AB and the USCIS policy guidance memorandum that was implementing AB, as I understand it. So I think both of those things are addressed by Judge Sullivan's injunction, and certainly AB is construed in the context of his very detailed opinion. Q. Thank you. A. Thank you. MS. GONZALES. You've saved time for rebuttal. MR. ERIK ANDERSON. Good morning, Your Honor. May it please the Court, Erik Anderson representing the Acting Attorney General in the case before the Court today. The Court is reviewing two different decisions by the Board under two different standards of review. There's a February 2018 decision dismissing Ms. Gonzalez-Veliz's appeal, which will be reviewed for substantial evidence, and if there were any legal issues, de novo, subject to deference. And then a subsequent June 2018 decision denying a motion to reconsider, which will be reviewed, if at all, solely for abuse of discretion. Now, where did these two orders come from? Ms. Gonzalez-Veliz, having been previously removed to Honduras, illegally reentered, and the DHS reinstated the removal order. As Your Honor noted, the reinstatement means that she could not pursue asylum. However, she could, after she was referred to the immigration judge, pursue withholding of removal under the INA and protection under the CAT regulations. She sought both, and she recounted how she had been harmed by a man in Bonilla with whom she lived for about two years and with whom she had a child. She identified her particular social group as women in Honduras in a brief. The immigration judge and board denied the withholding of removal application without casting any doubt on the cognizability of this group. However, they did find that Bonilla did not have her membership in such a group as a central reason. The record fully supports the board's decision in this case. Every time she testified about it, the harm she experienced at was both chronologically and causally connected to the suit for child support. She testified that she did not have problems during the two-year relationship. When she came to believe he was seeing another woman, she returned to her parents with their child. He had no problem with this, she testified. It was only a few weeks or months later she sued for child support, and very shortly thereafter began receiving what started as harassment and eventually escalated, but it's a constant reference to, you can't sue me for child support, I'm not going to go along with this. Even from the very early days up to what appears to be the last chronological event, which was again another horrific sexual assault, Bonilla's own friends were saying to third parties, don't intervene, this man gives this woman a lot of money. So the record evidence of her testimony is fully sufficient to allow the board to reach the finding it did in this case. What are you saying? Don't intervene, he gives her a lot of money, what is the point there? What point are you making with that piece of evidence? You're saying he's paying the child support, so don't intervene in the horrific, I'm sorry, I don't see the point. I'm saying that, well, your honor, at least there's no record evidence compelling a contrary conclusion. If that does not illustrate Bonilla's motive, okay, then that piece of testimony wouldn't be relevant to it. But there's no testimony that would compel a finding contrary to the board here about what his motive was. What if he had multiple motives? Well, if he had multiple motives, if she had testified he had multiple motives, the board would have been called on to analyze whether each was a central reason, whether only one was a central reason. However, after the immigration judge decided the case by finding that Bonilla's motive was the child support, Ms. Gonzalez released a brief to the board, never argued the immigration judge was required to conduct a mixed motive analysis. Without such an argument, she can't argue here, although she attempts to, that the agency erred by failing to conduct a mixed motive analysis. So for that, we believe the denial of the withholding of removal should survive review because there's evidence, or there's no evidence compelling a finding contrary to the board. As to the cat protection, again, the immigration judge and board denied the application for Honduran government acquiescence in the torture. She does not, for cat protection, have to establish connection to a particular social group. But Bonilla is a private actor. She had never been harmed by any individual who was a government actor. And the evidence, such as it is, fails to compel a finding of acquiescence. This evidence is a little bit tricky, isn't it, for your side? Because it is true that it says the officer got a call. You assume that he's hearing from his superior that he has to step away because the gentleman is politically connected or something like that. Well, her own testimony is that she was totally speculating as to the point. She denied. Well, it doesn't, you don't need her to tell us why. He had to step back from enforcing the law after someone called him an authority. Well, also at that point, Your Honor, I don't believe Bonilla was involved in any, I believe at that point it was still in the harassment stage. I'm not sure he was actually involved. I don't think the police officer saw torture ongoing in front of him when he stepped away. So what we know about the acquiescence is that she made police reports. On one of them, when she made the police report, the police told her, look, you know, it's unlikely we're going to be able to solve this case. We just don't have the resources to handle all of them. And under this court's law, that is insufficient to support a government acquiescence providing for protection under the CAF regulations. Okay. Let's talk about the other petition. Oh, the motion to reconsider. Ms. Gonzalez-Feliz filed a timely motion to reconsider with the board arguing that under matter of ARCG, its decision was wrong. A motion to reconsider allows an alien to bring one of three narrow procedural claims that an issue of factor law had been overlooked, an issue of factor law had been decided incorrectly, or that a change in law in her had occurred in the meantime. The board denied the motion and her brief to this court does not actually assert that her motion to reconsider was meritorious. The brief to this court is all tied up with the AB issue, which had been decided in the meantime. It was decided... He cites other authority that says he doesn't have to prove he would win. He just has to prove that it changed. Your Honor, I don't believe that pure change. I mean, we would agree if the board held someone to a high standard and subsequent precedent from the board itself, from the Supreme Court, from the circuit court says, no, no, no, the standard is much lower. We would probably be arguing for remand in that instance too, to allow the agency to adjudicate it. Also, if it was unclear what standard the board did or should apply, but subsequent precedent clarifies it, then too, the agency has to have a first chance to decide it new clear standard. But when the law changes against your favor, and certainly I don't know any alien who would prefer to go under matter of AB than under matter of ARCG. How has the law changed to her favor? It's AB is the law. AB is the law. And much of AB just restates prior law. You're correct on that. As to whether Ms. She should, and the attorney general said that was incorrect. You need, you can't accept the party's concessions to resolve these issues. You have to give careful attention to membership and harm on account of membership in that. Okay. I thought that you argued that we don't have jurisdiction and that that was your only argument on the second petition. Am I, are we wrong on that? First, I would note, is there any issue regarding whether her merit, whether her motion to the she hasn't argued her initial motion was meritorious. As to AB itself, you're right, Your Honor. All of these issues have not been presented to the board in the first instance. But how could she have presented that argument to the board in the first instance? Because the regulations do not allow you to submit to reconsider on a motion for reconsider. And so it was the BIA who came forward allegedly with a new reason at the end. And then there's no procedure under the regs to allow for a reconsider of a reconsider. Well, two approaches, Your Honor. The board always has authority to suspend to reconsider and the regulation doesn't prevent you from asking the board to suspend to reconsider. Perhaps more hopefully for Ms. Gonzalez-Valiz, she could file a motion to reopen saying matter of AB says this is the standard. Here's the social group I would articulate under matter of AB. Here's the evidence I would deduce to show I met all requirements for withholding under matter of AB. She hasn't done either yet. So instead, we have the board raising these issues on its own. I forget if it was 18 or 11 days after AB was decided. I think it was 18 days after AB was decided. And none of these issues about how much of a change and what change at all AB made have been addressed by the board. Some of them, if I could address the grace litigation, it's true that the position of the United States does not mean that AB means all domestic violence victims lose. It means they have to articulate a claim that meets the requirements of the act. And you can't define you or group by the harm. So in terms of AB being a complete preclusion of domestic violence claims, no, that's not the position of the United States. We would also, however, read grace as being directed to the credible fear process that DHS conducts when someone seeks admission without the required entry documents. The only reason the district court had jurisdiction to adjudicate this case, or to adjudicate the grace case, rather, is because of its connection to the credible fear process, which goes by habeas litigation in the District of the District of Columbia. Courts of Appeals see many more of these cases than the District of the District of Columbia does. Because of the ordinary processes, you get a final order of removal and then go to the court. We see these all the time. But I'm still concerned. It doesn't appear that you substantively engaged with the second petition. If you don't win on your procedural no-jurisdiction point, what do we do with the second petition? Send it to the board for the board to address what AB means. Well, I don't understand the argument that AB doesn't mean that this is not a cognizable group. It seems pretty clear. The Attorney General's session said that it would be difficult, as all asylum cases are. He did not say it would be impossible. Are you saying she has a cognizable claim? No, I haven't seen it yet. She has to offer it to the board in the first instance. So your first argument is we don't have jurisdiction, and second is you want us to send it back. You don't want us to resolve it on the statute and AB? The agency doesn't decide what AB means, Your Honor. Well, it seems like the district court in Washington, D.C. is deciding what AB means right now. Well, it addressed, you know, the DHS regulations implementing memo, sorry, not regulations. And AB itself. It addressed AB. However, it did so in a limited context, and its decision is subject to appeal. So, it may not be satisfying, Your Honor, but in the absence of the board having a chance to address any of these concerns about matter of AB, if you reject on the second petition, the motion to reconsider case, if you reject the exhaustion argument supported by Omari and Dale, you would say, go ahead, remit it to the board. There's no reason for this case to yet go back to the immigration judge. Why did the board raise a brand new point in a reconsideration case? I'm sorry, did you say why? Why did they raise a brand new point and make this problem? I don't know, Your Honor. I mean, if it had addressed the ARCG issues that Ms. Gonzalez-Valiz had asserted in her motion, we all agree, the court would be applying ARCG still. If it had applied ARCG to deny the motion of reconsideration, the court will review for the reasons stated by the board. Are we without power to decide, like Judge Wilkinson decided, that this is just circular, this group, in the Fourth Circuit? In this case, with the decision the board gave you, the board did not doubt cognizability here, Your Honor. It's true, AB says you can't define the social group by the subsequent persecution. Otherwise, it makes the social group a catch-all for every act of persecution. But given the court's review of the agency's decision, we'd ask to apply the chainery doctrine. So unless there are any other questions, we'd ask the court to deny the first petition under substantial evidence review. So you don't want us to set up a big competing injunction issue? I wouldn't want to explain myself back in the office about that one, Your Honor. But if the court doesn't dismiss the petition of the AB issues, we'd ask it to remand to the board. Thank you. Thank you. May it please the court, a few quick points on rebuttal. As the government noted, the approach here is constrained by chainery and the actual rationales offered in the final decision. The government said here that we did not argue at the BIA that the IJ had failed a mixed motive analysis. In our brief, we noted this, and I'll just note it again today, at page 82 of the record, we certainly did. I can quote that if you like, but 82 of the record has that. The government also said in the briefing in this case, this is at page 30 of its opening brief, that if Suyappa testified to multiple motives, then the agency would have had to analyze those two motives and the centrality of the two motives. Now the government did make an argument about live testimony being the only relevant thing. If you have concerns about that, I'm happy to discuss that. But the government was saying if there's testimony about the two possible motives, the agency would need to address the centrality. We agree, and Suyappa did testify as to a protected ground. The IJ did not even do a mixed motive analysis. That's very clear. If you look at the IJ decision, at 159 of the record, the IJ did no mixed motive analysis. The BIA purported to do that, but it did so in an erroneous way. Even if the child support request was an initial reason, a reason, maybe even a central reason, it's clear that another central reason, at least, was persecution based on the protected ground. Now, as to the second decision by the BIA, the order denying reconsideration, just to briefly address the exhaustion argument, I think we've addressed it, maybe even exhausted it, in our briefing here. But the statute authorizes one motion to reconsider. The government counsel referred to the regulation not barring us from filing it. I'm just going to read that regulation, which is 8 CFR 1003.2b2. A party may file only one motion to reconsider any given decision and may not seek reconsideration of a decision denying a previous motion to reconsider. There are a variety of cases and other authorities we cite. What do you get, though, if we uphold a sitting arguendo, that we uphold the first, the first petition, and we send back the second petition? What do you get? Do you get anything? So we, of course, would urge that hypothetical not become true. But if it is, if it does come to fruition, I mean, it's obviously not clear. You've thought about this before. I have. I have. Obviously, it's not clear whether ultimately there would be relief in the case or not. That would be something to be addressed on remand by the BIA. But two things I would note. One, the law here is clearly in flux. AB came out. The second decision in this case interpreted AB in a way that the government, in the Grace case and here today, walks away from and does not defend in its brief. So it's hard to... It's puzzling, isn't it? It is puzzling. The government doesn't have a more robust defense of the AG's ruling? I would agree. And then the other thing I would note, under your hypothetical, if we were to lose under the first decision but get a remand on the second decision, it is possible... Substantial evidence review, which is the standard here, and clearly erroneous review, which is the standard that governs a BIA review of factual finding, are not the same. And it is possible that on remand, the BIA could hold that the IJ had clearly erred. You're hoping that you'll get a settlement when you send it back to the agency because they have a good lawyer now. That's what you're hoping. We would welcome any relief for our client. That is certainly true. And I'm not disparaging any other lawyer along the way. I'm just noting that counsel on both sides have been very good. Thank you. Appreciate that. The final thing that I would note, just based on something that the government's counsel said today, he noted that when Suyapa lived with Bonilla, she was not harmed during that time frame. What she did testify to is that when they were together, he told her that women in Honduras who disobey the men they're in domestic relationships with are worthless and trash. That's at page 385 of the administrative record. And then when she attempted to leave, he carried out that view. He carried that forward by his actions to her, which again, this is not a case of simple harassment or stalking or something like that. This is a case where the actions and his words make quite clear that his motivation was to keep Suyapa trapped in this sexual relationship. And based on the Honduran cultural and societal norms, he has the ability to do that and the police do not intervene to protect her there. If there are no further questions, I'd urge the court to vacate and remand. Thank you. We have your argument. This concludes the